# EXHIBIT A

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
                         MARSHALL DIVISION


GREE, INC.,                    )
     Plaintiff,                )   Civil Action No.
                               )    2:10-cv-00070-JRG-RSP
VS.                            )    2:19-cv-00071-JRG-RSP
                               )
SUPERCELL OY,                  )
     Defendant                 )


                CONFIDENTIAL ATTORNEYS' EYES ONLY
              REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
                          ANDREW SHEPPARD
                          MARCH 25, 2020
```

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF ANDREW SHEPPARD, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Wednesday, March 25, 2020, from 9:21 a.m. to 4:04 p.m., before JANALYN ELKINS, CSR, in and for the State of Texas, reported by computerized stenotype machine, at the remote location of the court reporter, 101 Cove West, No. 102, Horseshoe Bay, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Page 1

CONFIDENTIAL - ATTORNEYS EYES ONLY

## Page 2

```
          APPEARANCES

FOR THE PLAINTIFF:
    TAYLOR LUDLAM (video teleconference)
    KILPATRICK, TOWNSEND & STOCKTON, LLP
    4208 Six Forks Road, Suite 1400
    Raleigh, North Carolina  27609
    Tel: (919) 420-1705  Fax: (919) 510-6141
    taludlam@kilpatricktownsend.com

FOR THE DEFENDANT:
    MICHAEL J. SACKSTEDER (video teleconference)
    JESSICA KAEMPF
    FENWICK & WEST, LLP
    555 California Street, 12th Floor
    San Francisco, California  94104
    Tel: (415) 875-2450
    msacksteder@fenwick.com


Also Present:
    MR. PETER ZIERLEIN (Videographer)
```

## Page 3

```
            INDEX
                                    PAGE

Appearances .................................  2

ANDREW SHEPPARD
    Examination by Mr. Sacksteder .............  4



            EXHIBITS

NO.         DESCRIPTION              PAGE
Exhibit 32  Guardians of Haven
            Presentation               10
Exhibit 33  GIE Two-Year Retrospective  19
Exhibit 34  Sheppard 00000001           72
Exhibit 35  Bates No. 54073             95
Exhibit 36  Bates No. 54074             95
Exhibit 37  Bates No. 1128             116
Exhibit 38  Bates No. 1129             133
Exhibit 39  Bates No. 38168            139
Exhibit 40  0-44                       139
Exhibit 41  0-46                       139
Exhibit 42  0-49                       139
Exhibit 43  0-53                       139
Exhibit 44  Bates No. 0037262          146
Exhibit 45  Bates No. 40511            151
Exhibit 46  Bates No. 89024            153
Exhibit 47  Bates No. 37755            155
Exhibit 48  Bates No. 50884            159
Exhibit 49  Bates No. 37780            164
Exhibit 50  Bates No. 89054            169
Exhibit 51  Bates No. 89110            170
```

## Page 4

 1    VIDEOGRAPHER:  Good morning.  We're on the
 2 record at 9:19 a.m. on March 25, 2020.  This is media
 3 unit No. 1 to the recorded deposition of Andrew Sheppard
 4 in the matter of GREE, Inc. versus Supercell Oy filed in
 5 the United States District Court for the Eastern
 6 District of Texas, Marshall division.  The case number
 7 is 219-CV-00070-JRGRSP.  This deposition is being held
 8 remotely.  My name is Peter Zierlein with Veritext, and
 9 the court reporter is Janalyn Elkins, also with
10 Veritext.
11        Will counsel please identify themselves for
12 the record.  Afterwards the court reporter will swear in
13 the witness.
14        MR. SACKSTEDER:  Michael Sacksteder of
15 Fenwick & West on behalf of Supercell, and with me
16 virtually is Jessica Kaempf also with Fenwick & West.
17        MS. LUDLAM:  Taylor Ludlam with Kilpatrick
18 Townsend on behalf of GREE.
19        ANDREW JEREMY SHEPPARD,
20 having been duly sworn, testified as follows:
21            EXAMINATION
22 BY MR. SACKSTEDER:
23    Q.  Good morning, Mr. Sheppard.
24    A.  Good morning.
25    Q.  Can you please tell me your name and spell it

## Page 5

 1 for the record?
 2    A.  Yes.  It's Andrew Jeremy Sheppard, A-N-D-R-E-W,
 3 J-E-R-E-M-Y, S-H-E-P-P-A-R-D.
 4    Q.  Have you had your deposition taken before?
 5    A.  First time.
 6    Q.  I'm sure you went through some -- some
 7 instructions with your counsel, but just a few of them
 8 since we're, you know, in an unusual circumstance for
 9 taking the deposition today.
10        I'm going to be asking you questions.  You
11 will be answering them.  If you don't understand my
12 question, will you please let me know and so that I can
13 rephrase it.  And if you answer without asking about
14 clarification, I'll assume that you understood what I
15 asked you.  Is that fair?
16    A.  Yes, understood.
17    Q.  You do understand that you're under oath today?
18    A.  Yes, definitely.
19    Q.  And is there any reason why you can't give
20 accurate testimony today?
21    A.  Outside of any confidentiality agreements in
22 the past, that will be the only reason I could think of.
23 But I intend to give 100 percent true testimony.
24    Q.  Where do you work?
25    A.  Right now I am self-employed through a few

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**Page 6**

1 different entities. One is Cedarview Consulting, which
2 has all my business consulting arrangements and then a
3 number of real estate LLCs which contain investment
4 properties.
5    Q. But you worked for a couple of companies that
6 were part of the corporate family of GREE, Incorporated;
7 is that correct?
8    A. Yes.
9    Q. What companies in the GREE group have you
10 worked for?
11    A. GREE International, Inc. and GREE International
12 Entertainment, Inc.
13    Q. What is -- or was GREE International, Inc.?
14    A. GREE International, Inc. was created by my
15 predecessors. It was intended to focus on Western
16 market expansion of the GREE business, GIE partner.
17    Q. Does GREE International, Inc., exist?
18    A. Not to my knowledge.
19    Q. And what is GREE or was GREE International
20 Entertainment, Inc.?
21    A. GREE International Entertainment was an entity
22 created to take over ownership of GREE International,
23 Inc., or at least the ongoing operations after the
24 original business was written off.
25    Q. What is GREE Incorporated?

**Page 7**

1    A. GREE Incorporated is the Japanese parent
2 company for, I guess, the family of entities under the
3 GREE umbrella.
4        VIDEOGRAPHER: Excuse me. Can we go off
5 the record really quick? This is Peter, the
6 videographer. I've just got to fix something really
7 fast.
8        MR. SACKSTEDER: Sure.
9        VIDEOGRAPHER: Going off the record. The
10 time is 9:24.
11        (Discussion off the record.)
12        VIDEOGRAPHER: Back on the record. The
13 time is 9:44.
14    Q. (BY MR. SACKSTEDER) Okay. What is GREE,
15 Incorporated again?
16    A. GREE Incorporated is the parent company for the
17 family of GREE entities, based in Tokyo, Japan.
18    Q. So were you employed by GREE International,
19 Inc. when you first joined GREE?
20    A. Yes.
21    Q. When did you do that?
22    A. I joined in August of 2014.
23    Q. What was your job when you joined in August of
24 2014?
25    A. I was chief operating officer.

**Page 8**

1    Q. Did your job change at any time while you were
2 at either GREE International, Inc. or GREE --
3    A. Yes, I was promoted to chief executive officer
4 and also appointed to the board of directors for GREE
5 International, Inc.
6    Q. Did you continue as chief executive officer
7 when the transition was made to GREE International
8 Entertainment?
9    A. Yes. Although, I don't recall exact
10 chronology.
11    Q. To the best of your recollection, is that what
12 happened?
13    A. Yes.
14    Q. And when, to the best of your recollection, was
15 that change made from -- strike that.
16        Will you understand if I refer to GREE
17 International, Inc. as GII and GREE International
18 Entertainment as GIE?
19    A. Yes.
20    Q. Approximately when did the transition occur
21 from GII to GIE?
22    A. It would have been late 2015 or early 2016.
23    Q. What was the purpose of that change?
24    A. There were -- there was a large amount of
25 goodwill within GII that was under Japanese conference

**Page 9**

1 rules of being expensed making it hard for the
2 subsidiary to be profitable on a JGAP basis. And so the
3 intention of shutting down the GII entity was to release
4 that goodwill and start fresh.
5    Q. Are you referring to goodwill in accounting
6 terms?
7    A. Yes.
8    Q. So it's -- it's kind of what's left over when
9 you've counted all the more tangible assets; is that
10 accurate?
11    A. Yes.
12    Q. All right. And the goodwill was being
13 accounted for as an expense rather than something else?
14    A. Correct.
15    Q. Were there any other substantive changes that
16 were made when GII changed to GIE?
17    A. Not that I'm aware of.
18    Q. What was the business of GII and GIE?
19    A. The mandate was to create a, I would say,
20 isolated or charted, to use a technical term, smart
21 phone, game development operation that could build
22 market leading products for Western customers.
23    Q. How long had GII existed when you joined the
24 company?
25    A. I believe four to five years. And I'm -- I

CONFIDENTIAL - ATTORNEYS EYES ONLY

**Page 10**

1  didn't create the organization so I'm not positive of
2  the duration.
3     Q. Okay. At the time that you joined GII, had GII
4  itself developed any games?
5     A. They had. I was aware of a few in my role
6  prior to GII. I was aware of them watching a few
7  titles. And then they acquired a few titles as well.
8     Q. What titles were developed by GII that you were
9  aware of?
10    A. The only game I can recall was a zombie themed
11 role playing game, which I can't remember the name of,
12 which did not survive long in the marketplace. Yeah,
13 and then that's the original development.
14    Q. Okay. And what games had been acquired?
15    A. It was the suite of games that were developed
16 by Funzio as a start-up.
17    Q. We have put in the introduced exhibit folder a
18 document that is a Mark Sheppard and a bunch of zeros
19 and then 17. Are you able to see that?
20    A. I am.
21    Q. Okay. And we will be calling that Exhibit 32
22 in this deposition.
23        (Exhibit No. 32 was marked.)
24    Q. (BY MR. SACKSTEDER) Can you take a look at
25 that document, Exhibit 32, and tell me what it is?

**Page 11**

1     A. Okay. I'm downloading it now.
2         MS. LUDLAM: Yeah, Michael, it says the
3  file is too large to be previewed.
4         MR. SACKSTEDER: Okay.
5         MS. LUDLAM: So I think he's doing what I'm
6  doing, which is downloading.
7         THE WITNESS: I'll wait until everyone has
8  a copy. But I have 10 seconds.
9         MR. SACKSTEDER: If you have a good
10 connection. It took me a long time.
11        THE WITNESS: Yeah, one of the benefits.
12        MS. LUDLAM: I've got it up.
13        MR. SACKSTEDER: Do you have it?
14        THE WITNESS: I do. Yes.
15    Q. (BY MR. SACKSTEDER) Okay. Can you look
16 through -- are you able to scroll through the exhibit?
17    A. I am.
18    Q. Can you look through it and tell me what it is?
19    A. Let me go through it. This is a presentation
20 that Guardians of Haven put together to very cleanly
21 communicate the story of GREE International to, in this
22 case, Apple.
23    Q. Did you participate in the preparation of
24 Exhibit 32?
25    A. I reviewed and approved it. I believe I also

**Page 12**

1  provided counsel on the outline of the presentation
2  before we built new slides. That's my preferred
3  operating approach. And then I was involved in the
4  presentations app on Google.
5     Q. Why were you giving a presentation to Apple?
6     A. The major mobile phone platform holders have
7  for all intents and purposes publishing teams that
8  manage the merchandising of games on their stores, their
9  app stores, and those teams will provide promotional
10 support for a game at launch and subsequently with
11 content updates and refreshes. And in order to earn
12 that privilege, you have to get them excited about the
13 game.
14    Q. And you mentioned Guardians of Haven, and it
15 also references Guardians of Haven on the first page of
16 Exhibit 32. Can you tell me what Guardians of Haven is?
17    A. Yes. That was the title I had lobbied to
18 Greenlight about a month of two after I joined in -- in
19 the realization of the concept. It was with the
20 culmination of a bunch of planning activities that led
21 to a national game being developed.
22    Q. It was a game, right, the game being built?
23    A. Yes.
24    Q. Was Guardians of Haven ever released to the
25 public?

**Page 13**

1     A. It was released in beta, which means that it
2  was available without marketing support or very limited
3  marketing support in select markets and in select
4  languages, but it was never fully released.
5     Q. What markets and languages was it released in?
6     A. We had it in English because everyone that was
7  working on the game was English speaking. And I believe
8  we put it in Philippines, although that wasn't the best
9  market to beta in. I can't recall beyond that.
10    Q. Was it possible to -- for anyone in the United
11 States to download and play Guardians of Haven at
12 anytime?
13        MS. LUDLAM: Objection to form. Sorry.
14 I'll try not to talk over you. Objection to form.
15        THE WITNESS: Sorry. Yes, but it was
16 not -- you'd have to know the name of the game. And
17 they are always ways to work around geofencing.
18    Q. You'd have to know the name of the game, did
19 you say?
20    A. Yes.
21    Q. All right. So -- so if I knew the name of the
22 game, Guardians of Haven, could I go to the app store
23 that Apple runs and download Guardians of Haven at
24 anytime?
25    A. If -- if my recollection is correct and it was

4 (Pages 10 - 13)

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    Q.  And the article references a statement from
 2  GREE about doing that, correct?
 3    A.  I see the statement.
 4    Q.  And the fourth paragraph of the article said
 5  the statement from GREE describes this as, quote,
 6  (Reading:) The starting point for decisive change in
 7  GREE's global strategy for games with the company
 8  shifting to a, quote, Japan-first-content strategy to
 9  the plan being to launch games to its home territory and
10  then localize and distribute the most successful ones in
11  other markets around the world.
12        Did you understand that the decision to
13  close the Western operations was part of that Japan
14  first content strategy?
15        MS. LUDLAM:  Objection to form.
16        THE WITNESS:  I would say that describes
17  the operation reality of the business.  I just recall I
18  recommended shutting down the business so...
19    Q.  (BY MR. SACKSTEDER) I'm sorry.  I wasn't able
20  to hear you.
21    A.  Oh, yeah, since I initiated the idea of
22  shutting down the Western business, all that would
23  remain would be Japanese titles.
24    Q.  Let's move on from that exhibit.  The next
25  exhibit is Exhibit 51.  It's Bates number 89110.
                                              Page 170
```

```
 1  move?
 2        MS. LUDLAM:  Objection to form.
 3        THE WITNESS:  Yes and no.  I mean, we
 4  acquired the studio simultaneously, so it was more about
 5  bringing the team in line with the market.  The
 6  Melbourne team was incredibly talented, very proud of
 7  their work, especially given the time pressure they had.
 8  And the team in San Francisco just was not able to
 9  compete at that level.  It did not have the experience.
10    Q.  (BY MR. SACKSTEDER) Did you do anything to
11  prepare for your deposition?
12    A.  I talked to Taylor, and I just learned about
13  the format and that was the extent of it.
14    Q.  Did you talk to Ms. Ludlam virtually by video
15  conference or telephone?
16        MS. LUDLAM:  I'm just going to object and
17  just be careful not to disclose any privileged
18  information.  But you can otherwise answer.
19    Q.  (BY MR. SACKSTEDER) Yeah.  Let me make it
20  clear.  I don't want you to tell me what you and
21  Ms. Ludlam discussed.
22        MS. LUDLAM:  Thank you.
23    Q.  (BY MR. SACKSTEDER) I'm just looking at the
24  mechanism you used to talk and later on I'll ask you
25  when it happened and how long, et cetera.
                                              Page 172
```

```
 1        (Exhibit No. 51 was marked.)
 2    Q.  (BY MR. SACKSTEDER) And it, unfortunately,
 3  needs to be rotated.  89110, Exhibit 51, is another
 4  article about closing the San Francisco operation,
 5  correct?
 6    A.  It looks like it, yes.
 7    Q.  And the reasons for closing the operation were
 8  ones that you described previously, correct?
 9    A.  This one looks to be dated 2015, so I think it
10  refers to different set of e-mails.
11    Q.  Oh, I see.  Okay.  So there was an earlier
12  decision to scale back some operations in San Francisco;
13  is that correct?
14    A.  Yes.
15    Q.  What happened there?
16    A.  This was one of the hard decisions I had to
17  make when I joined.  When I joined the office, there
18  were 400 FTEs, full-time equivalents, in San Francisco
19  that had been hired by the Funzio team.  And as I
20  mentioned before, the Funzio management team had all
21  left.  It was widely understood and recognized within
22  the business unit that that staffing was not aligned
23  with the market and was also incredibly expensive being
24  based in San Francisco.
25    Q.  So was that decision primarily a cost-cutting
                                              Page 171
```

```
 1    A.  Gacha.  Thank you.  All right.  Yes, we did use
 2  media for this.
 3    Q.  How long did you speak to her?
 4    A.  I don't recall.
 5    Q.  Did you speak to anybody who currently works
 6  for GREE in preparing for your deposition?
 7    A.  I did reach out to EJ Foreih and asked for
 8  instruction to Taylor.  But we didn't talk about
 9  anything else.
10    Q.  Who is the person you talked to?
11    A.  EJ Foreih.  I don't know if he's a GREE
12  employee or contractor.  He was my old counsel at GREE.
13  And so I just reached out to him for direction
14  on what --
15        MS. LUDLAM:  Hold on.  Hold on.  Andrew, I
16  don't want you to -- Michael, EJ is an attorney for
17  GREE.  So Andrew, just caution you not to disclose any
18  communications with EJ.
19        THE WITNESS:  Okay.  Apologies.
20    Q.  (BY MR. SACKSTEDER) You got Ms. Ludlam's name
21  or you got her firm's name from EJ; is that correct?
22    A.  That's correct.
23        MS. LUDLAM:  I'm going to object to the
24  extent it calls for him to disclose privileged
25  communication.
                                              Page 173
```

44 (Pages 170 - 173)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**Page 174**

1  MR. SACKSTEDER: I don't want privileged
2  communications.
3  MS. LUDLAM: Great. I'm just trying to
4  tell you so you understand that that's the extent.
5  Q. (BY MR. SACKSTEDER) Can you answer the
6  question, sir?
7  A. I will take the advice of Counsel.
8  Q. Okay. You reached out to EJ from GREE, and you
9  ended up talking to Ms. Ludlam, correct?
10 A. Yes.
11 Q. Did EJ provide you any legal advice in your
12 conversation?
13 MS. LUDLAM: To be clear, I just -- don't
14 disclose any substance of conversations with your legal
15 counsel. But you can answer his question.
16 THE WITNESS: I accept that, counsel.
17 MS. LUDLAM: Okay. Good.
18 Q. (BY MR. SACKSTEDER ) Did you talk to anybody
19 else at GREE?
20 A. No.
21 Q. Did you talk to anybody else anywhere about
22 your deposition?
23 A. No.
24 Q. Did you ever consider EJ to be your lawyer in
25 your conversations that preceded your deposition?

**Page 175**

1  A. I don't want to be in violation of anything.
2  But -- so I won't answer, I guess. I don't know. I
3  don't know.
4  Q. Okay.
5  MS. LUDLAM: Michael.
6  Q. (BY MR. SACKSTEDER) Not trying to get anything
7  you're not supposed to give me.
8  A. Yeah.
9  Q. When you were -- and this is a yes-no question.
10 When you were preparing for your deposition, did you
11 review any documents including electronically?
12 A. I'll defer to counsel.
13 Q. I think you're allowed to answer yes or no on
14 that.
15 A. Yeah, I just want to be incredibly careful of
16 anything. I just want to be above the bar on everything
17 and I don't want to be entrapped or anything.
18 MS. LUDLAM: He's asking a yes or no
19 question so you can answer.
20 THE WITNESS: Yes.
21 Q. (BY MR. SACKSTEDER) Did any of the documents
22 you reviewed in preparing for your deposition refresh
23 your recollection about anything?
24 A. Not that I can recall. It's all so long ago.
25 MR. SACKSTEDER: Let's go off the record

**Page 176**

1  and I'll see if I have anything else.
2  VIDEOGRAPHER: Going off the record
3  at 3:54.
4  (Brief recess.)
5  VIDEOGRAPHER: Back on the record. The
6  time is 4:03.
7  MR. SACKSTEDER: I don't have anymore
8  questions. Thanks for your time.
9  MS. LUDLAM: We would just like to reserve
10 the right to review and sign and wanted to make sure the
11 transcript was marked confidential attorney's eyes only.
12 No objection.
13 VIDEOGRAPHER: This concludes the
14 deposition --
15 THE REPORTER: Let me get this on the
16 record real quick.
17 Did you -- Ms. Ludlam, you want a copy of
18 the transcript?
19 MS. LUDLAM: Our paralegal submitted a
20 standing order during the course of this deposition. So
21 she has everything.
22 THE REPORTER: Perfect.
23 VIDEOGRAPHER: Concluding the deposition of
24 Andrew Sheppard. Going off the record. The time
25 is 4:04.

**Page 177**

1  (Proceedings concluded at 4:04 p.m.)
2
3  ACKNOWLEDGMENT OF DEPONENT
   I, ANDREW SHEPPARD, do hereby certify that I
4  have read the foregoing pages and that the same is a
5  correct transcription of the answers given by me to the
6  questions therein propounded, except for the corrections
7  or changes in form or substance, if any, noted on the
8  attached errata page.
9
10 _____
   ANDREW SHEPPARD            DATE
11
12
13 THE STATE OF TEXAS )
                      )
14 COUNTY OF _____ )
15
       Before me, _____, on this day
16 personally appeared ANDREW SHEPPARD, known to me (or
   proved to me under oath or through
17 (description of identity card or other document) to be
   the person whose name is subscribed to the foregoing
18 instrument and acknowledged to me that they executed the
   same for the purposes and consideration therein
19 expressed.
20    Given under my hand and seal of office this
   ____ day of _____, _____.
21
22 _____
   NOTARY PUBLIC IN AND FOR
23    THE STATE OF
24
25

45 (Pages 174 - 177)

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              REPORTER'S CERTIFICATION
                DEPOSITION OF ANDREW SHEPPARD
 2                 TAKEN MARCH 25, 2020
 3         I, JANALYN ELKINS, Certified Shorthand
 4  Reporter in and for the State of Texas, hereby certify
 5  to the following:
 6         That the witness, ANDREW SHEPPARD, was duly
 7  sworn by the officer and that the transcript of the oral
 8  deposition is a true record of the testimony given by
 9  the witness;
10         That the original deposition was delivered to
11  TAYLOR LUDLAM / MICHAEL J. SACKSTEDER;
12         That a copy of this certificate was served on
13  all parties and/or the witness shown herein on
14  _____.
15         I further certify that pursuant to FRCP No.
16  30(f)(i) that the signature of the deponent was
17  requested by the deponent or a party before the
18  completion of the deposition and that the signature is
19  to be returned within 30 days from date of receipt of
20  the transcript.  If returned, the attached Changes and
21  Signature Page contains any changes and the reasons
22  therefor.
23         I further certify that I am neither counsel
24  for, related to, nor employed by any of the parties in
25  the action in which this proceeding was taken, and
                                                    Page 178
```

```
 1  further that I am not financially or otherwise
 2  interested in the outcome of the action.
 3         Certified to by me this 27th day of March 2020.
 4
 5
 6         <%signature%>
            JANALYN ELKINS
 7          Texas CSR 3631
         Expiration Date 12/31/2020
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 179
```

46 (Pages 178 - 179)